Filed 2/29/16  Lois V. v. Superior Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| Lois V., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF CONTRA COSTA COUNTY, <br><br> Respondent; <br><br> CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU et al., <br><br> Real Parties in Interest. | A146815 <br><br> (Contra Costa County Super. Ct. Nos. J14-00789, J14-00790, J14-00791) |

Lois V. (mother) petitions for an extraordinary writ after the juvenile court terminated reunification services regarding three of her children at a combined six-month/12-month status review hearing and scheduled a permanency planning hearing for them pursuant to Welfare and Institutions Code section 366.26.[1]  Mother argues the court erred because there is not substantial evidence that respondent Contra Costa County Children & Family Services Bureau (CFS) provided her with reasonable services nor that the children could not be returned to her within 18 months from the initial removal.  We conclude the juvenile court did not err in either respect and deny the petition.

---

[1]  All statutory citations herein are to the Welfare and Institutions Code.

1

## BACKGROUND

Mother's petition relates to the juvenile court's rulings in dependency proceedings regarding her five children, S.B. (age 14), J.H. (13), M.G. (9), Z.D. (4) and N.D. (2).[2] Her petition specifically concerns the court's decision to terminate reunification services regarding J.H., Z.D. and N.D.[3] Prior to the agency's initiation of the proceedings, they were living with mother, who had been the subject of numerous referrals over the years.[4][5]

## I.

### *The Proceedings in Alameda County Superior Court*

### A. The Initial Petition and the Agency's Jurisdiction/Disposition Report

On January 2, 2014, Alameda County Social Services (the agency) filed petitions for all five children pursuant section 300, subdivisions (b)[6] and (g).[7] The petitions

---

[2] These ages are as of the time the dependency proceedings were initiated.

[3] M.G. was ultimately placed in her father's custody and S.B. was placed in a group home. They are not subjects of mother's petition.

[4] In the eleven years preceding this petition, mother had been referred to child welfare agencies on sixteen occasions for general neglect, sexual abuse and physical abuse. Twelve had been investigated and determined to be "unfounded," and four had been "evaluate[d] out," meaning there was not sufficient evidence to assign a referral to an investigation. (*In re Aurora P*., 241 Cal.App.4th 1142, 1149 fn. 4.)

[5] J.H.'s father is deceased. Z.D. and N.D.'s father, Antonio D., participated in the proceedings. He is not a party to mother's petition either.

[6] That subsection provides, as relevant here, that a child may be adjudged a dependent of the juvenile court if he or she has suffered or is at substantial risk of suffering serious physical harm or illness as a result of the failure or inability of his or her parent to adequately supervise or protect the child or to provide the child with adequate food, clothing, shelter, medical treatment or regular care.

[7] That subsection provides in relevant part that a child may be adjudged a dependent of the court if he or she "has been left without any provision for support" or "the child's parent has been incarcerated or institutionalized and cannot arrange for the care of the child; or a relative or other adult custodian with whom the child resides or has been left is unwilling or unable to provide care or support for the child, the whereabouts of the parent are unknown, and reasonable efforts to locate the parent have been unsuccessful."

alleged that N.D., then two years old, was found unsupervised in a home that appeared unsafe for young children; S.B., then fourteen years old, had "run away from home to prostitute"; the other siblings were "generally unsupervised by the mother"; the home was "very dirty, cluttered with garbage lying around the home"; and the ability of the four alleged fathers of the five children to provide and care for them was "unknown." The agency amended the petitions later that same month to add that, when found unsupervised, N.D. was needing a diaper change and that mother had "squatters living in her home."

In its January 22, 2014 jurisdiction/disposition report, the agency recommended that the court find the allegations of the petition true and order that J.H., M.G., Z.D. and N.D. remain in mother's care, that S.B., who had been detained by police,[8] remain out of the home, and that mother be provided services.

The agency reported that an emergency response worker, Tuitasi, reported on October 30, 2013, that she visited the family's home and found N.D. outside, unsupervised. Tuitasi observed N.D. walking through a garage that had a broken door "that could close unexpectedly on to the child," "playing in a back yard with discarded items such as an old dirty couch with exposed metal springs and a mat," and "jumping from a sofa pillow onto the mat." N.D.'s diaper was sagging and needed to be changed. The home did not appear safe for very young children: there were piles of old dried food in garden pots, "about 30 discarded chicken bones in an upside down stool" and "dirty dishes in the sink and throughout the kitchen," the floors were "dirty to the point of being almost black in some areas," and "[t]here were stacks of clothing and towels intermixed with trash (including old food boxes) in the dining room areas without any 'pathways' to easily walk on. The home appeared as a 'hoarder' home" and was cluttered with clothing, toys and furniture.

---

[8] The officer reported that S.B. had been prostituting herself. She told police she had been taken at gunpoint and forced into prostitution. Two persons were arrested in Hayward, and charged with offenses related to pimping.

3

Tuitasi reported that mother eventually appeared and said she had been sleeping. Tuitasi told her to clean up, and she complied. Mother informed Tuitasi she could use some help because she had recently suffered a stroke and her mother, who had been her support system, was in hospice care.

Mother told Tuitasi that S.B. had run away two weeks before and been gone from September 30, 2013, to October 17, 2013, and had said she went to Las Vegas to prostitute and that she had prostituted in the past. Mother had not filed a missing person's report. A referral for general neglect by mother was made.

On November 12, 2013, a caller to the agency's hotline reported that the children were being sexually abused. Squatters and mother's 17-year-old boyfriend were living in the home, S.B. and the 17 year old were having sex, and it was unknown if the sex was consensual. The home had no food, was "an utter mess," and had garbage and clutter throughout. The squatters and mother were beating the children with "a broken back scratcher, their hands, and with a belt (metal holes side of belt)." N.D. and Z.D. were hit the most and Z.D. had "a welt on his upper thigh area from being hit by one of the squatters." Also, mother " 'snorts cocaine.' "

Tuitasi visited the home that same day and found Z.D. and N.D. without apparent marks, bruises or injuries. During that and a later visit, she "did not observe any signs of abuse or neglect" of them and noted that they "appeared closely bonded with both their mother and older sibling—[S.B.]." Antonio, the alleged father of Z.D. and N.D., was in the home when Tuitasi visited. He told her "that he cares for the minors outside of the home when he is not at work" and "does what he can to support the mother with caring for the minors," but "that the majority of his income is taken by child support for his other children that reside in Texas."

J.H. told Tuitasi "that the situation at home could change if they all work together to keep the home clean and help his mother." Asked about the lack of food in the home, he said his maternal aunt and her children "eat all their food." He had been prescribed Ritalin and Concerta to address ADHD, but he "could not recall the last time he took his medications" because mother was "having a hard time obtaining" them. He attributed his

4

mother's stress mostly to S.B.. He said he had "been angry to the point of physically attacking [S.B.]." He did not disclose any abuse or neglect.

School records obtained for J.H. demonstrated he had attention problems, presumably related to his ADHD, some behavior problems and a longstanding truancy problem. His middle school reported "a history of frequent absences" dating back to kindergarten, ranging from 32 to 48 days each year. He had been suspended for 8 days in the current (his seventh grade) year for "putting his hands on other students" and "physical injury to peers."

S.B. discussed with Tuitasi being kidnapped and forced into prostitution. She stated that mother often "chooses men over her and her siblings." She vacillated between saying they did not need to be removed from mother and that she did not want to be with mother. She said her maternal grandmother had been her mother and that mother was not a parent figure in her life. J.H. had attacked her with his football cleats and had "pulled a knife on her." She denied having had sex with a 17-year-old male at home. Mother reported that S.B. was "diagnosed as Severely Emotionally Disturbed" and had been prescribed medications, but did not have them at the time.

At an unannounced visit on November 19, 2013, Tuitasi found mother's godfather supervising the children, including M.G. Mother was out looking for M.G., and returned in distress. She said that because of a mix-up, M.G. had been taken to an after-school program without the family knowing it. Mother was very upset with the school, but the school advised that mother's contact phone numbers on the emergency card were incorrect and/or disconnected. A Union City police officer responded to the home and "shared concerns of the frequent police responses to the family home for complaints of the condition of the home and neglect to the children."

On the same date, M.G. presented as "friendly and happy," "well-mannered, dressed in clean clothing, and in good general health." She reported that she was doing well in school and that she enjoyed visits with her father and felt safe with her mother. Her greatest fear was " 'being taken from her mother.' " She had "overheard the adults talking about keeping the home clean so that this would not happen." She said she was

5

"supposed to have medications however her mother is having a hard time getting it." Mother reported that M.G. was born with "Kawasaki Disease" and had a prescription for a nebulizer, but "that it continues to be a challenge to obtain [M.G.]'s prescription as the last one was lost."

On November 21, 2013, Tuitasi received a voicemail message from mother requesting "resources for diapers and food." Tuitasi provided her "a resource in Union City for diapers and food" and "a resource for hot food in Hayward."

Tuitasi stated that mother presented "as forthcoming and cooperative." Her speech was slurred and she spoke out of one side of her mouth. She reported having suffered a stroke because of the stress of "grandmother's hospitalization, dealing with S.B.'s difficult behaviors, and caring for the household on her own." When Tuitasi referred to the condition of the home, lack of supervision of J.H. and N.D., sexual abuse to S.B., and mother's failure to follow through with a program to help maintain stability in the home, mother described "feeling overwhelmed in dealing with the maternal grandmother's absence from the home." She reported that her mother had "carried her through a lot," "handled the SSI monies," and "held the family together." She reported suffering "from a few mini strokes" and being hospitalized. She also stated she had "had a change in phone numbers." As for the lack of food in the home, mother said her food stamps were not enough to last throughout the month for a family of six and that she used her SSI monies for the rent. Mother denied that the children were left unsupervised and stated "there are too many members of the household for her smaller children to wander off." Mother said "her main stress [was] dealing with [S.B.]," who was "defiant and disrespectful," and that "[S.B.]'s removal from the home may lift some of the stress in the home." She stated that S.B. and J.H. had "pulled knives out on each other" and that she had contacted the police during that incident. Mother said "the grandmother has been a strong parent figure to her children." By the time the agency report was filed the grandmother had died.

Mother reported being diagnosed with bipolar as a teen. She stated she had a cyst on her ovary and reported that she was taking a medication for diabetes, Vicodin for pain

and antibiotics.  She reported that she was not taking medications for mental health.  In an investigation earlier in 2013, she had reported that she had schizophrenia and was taking Zyprexa.  Mother denied any drug or alcohol abuse issues.

Mother had been arrested in June 2013.  She told Tuitasi that she had been cited as the parent because S.B. was shoplifting.

Mother gave Tuitasi an address for Antonio, but could not for the other fathers.  Mother said M.G.'s father was active in M.G.'s life and had recently begun taking her for weekend visits, but mother did not have his contact information.  She did not know where S.B.'s and J.H.'s fathers were, and said there was a restraining order protecting S.B. from her father.

The agency concluded that the allegation of general neglect was substantiated.  There were a "multitude of ongoing concerns" having to do with "the number of children involved, the dynamics within the family, mental and health issues, and the age development of the children."  Although mother "appear[ed] to be doing the best she can[,] . . . previous concerns have resurfaced and the issues appear[ed] to be escalating in regard to the lack of food for the children, the lack of follow through for medications for the children and mother (mental health meds that the teens need), and mother's lack of ability to maintain stability even with the family support and previous cps [child protective services] interventions."  Mother's "lack of follow through has placed the family back in the same situation that was previously investigated."

The agency concluded that the allegation of sexual abuse was "unfounded," noting "[t]he minors did not make any disclosures of sexual abuse," although S.B. had reported "being sexually exploited in Reno and Richmond."  It concluded there were "no safety concerns at this time that would prevent the children from remaining in the home," but observed that "[t]he current risk level is very high due to past cps history, current health and mental health issues that are minimally being addressed, the current situation within the home, as well as the [mother's] lack of ability to maintain stability in the family home (even with short term assistance from family, friends, and cps)."

7

The agency recommended that the children other than S.B. remain at home with mother and that the court order extensive family maintenance services. The agency's recommended case plan included that mother be provided with general counseling, a psychiatric/psychological evaluation, and psychotropic medication evaluation and monitoring.

## B. The Court's Jurisdiction/Disposition Hearing

On January 22, 2014, the juvenile court held an uncontested hearing on the agency's petition. Mother (and Antonio) submitted to the allegations. The court found true the allegations of neglect and lack of support in the petition, as amended. It adjudged the children to be dependents of the court. It adopted the agency's recommendations that the children other than S.B. continue to reside in the home of mother under the supervision of the agency, and ordered the agency to provide family maintenance services to mother. It ordered mother to "cooperate with the Child Welfare Worker and to participate in all aspects of the case plan" and "to ensure the child(ren)'s regular school attendance."

## C. The Agency's Status Review Report and Court's Transfer Order

On June 19, 2014, the agency filed a status review report in which it recommended that J.H., M.G., Z.D. and N.D. remain in mother's home but that their cases be transferred to Contra Costa County. The agency stated that in February 2014 "the mother moved with the minors to the home of her pastor, Ms. Paula Clark, in Antioch, CA." Mother stated she moved there "because the family was not safe in her home in Union City." During the six months since the last report, "mother was hospitalized at least three times, in various hospitals, for various ailments that could not be verified or documented by the undersigned. The mother was receiving strong pain medications intravenously." "Mother stated that she was living in the home of the pastor," but she reportedly "was not there for long periods of time."

Further, the agency reported, "mother did not participate in a medication evaluation, a psychological evaluation, individual counseling family counseling as well as therapy for the minors. She stated that her pastor is providing counseling for her

8

family and that she does not want anyone [else] counseling or medicating her or her children." Phone conversations with mother, the pastor and Danielle Sacks of Project Permanence "were very confusing" and that "[i]nformation regarding the mother's whereabouts, her illnesses and her willingness to participate in the case plan did not add up. At times the mother was evasive and she refused to disclose where she or the children were." Further, mother had failed to provide the social worker with information regarding current medical exams and dental check-ups for the minors.

Mother said she had found housing in Oakley, California, and the social worker had applied for move-in costs for her. However, the agency wrote, "[i]t has been a challenge to engage the mother in services as she has been absent, evasive and not forthcoming. The stability of the family and the ability of the mother to care for the minors on her own, consistently, and to provide a stable and consistent home for them remains in question." Mother also said she had scheduled the medication evaluation and psychological services for herself and the children in Antioch. The social worker "hoped" mother would "comply with the orders of the Court."

The agency further reported that during visits, J.H. had "appeared guarded and somewhat upset," "quiet" and "not very expressive." J.H.'s teacher reported that he missed school from March 19 to 28, 2014, and again from April 23 to May 5, 2014. When he "came back from his long absence, his behavior was disruptive and he was disrespectful to staff" although on "some days" he "was cooperative, personable and . . . working hard." J.H., when asked by the social worker, "did not want to say why he missed school so much." Mother denied that he had missed school. J.H. was placed "in an Alternative Education Program (because he was expelled from his regular school in Union City)."

Although J.H. had been prescribed drugs for his ADHD, mother stated "she does not want her child medicated and that she has no intentions to give him medications." The social worker provided mother a referral for J.H. for counseling and instructed her to schedule appointments for him for March, April and May, but there was "no evidence that the minor started to attend counseling."

9

Mother had been advised to schedule a physical and a dental appointment for M.G., but apparently had not done so as of the time of the agency's report. M.G.'s teacher reported she was doing well and there were no academic or behavioral concerns. She appeared clean, healthy, expressive, friendly and bonded to her mother and siblings.

Z.D. appeared calm, expressive, friendly, in excellent spirits, clean, healthy and energetic on visits with the social worker. He had a medical visit in May 2014. He appeared to be "developmentally on track." Mother said he was on a waiting list for a pre-school in Antioch.

The portion of the report pertaining to N.D., if any, is not contained in the record.

On July 9, 2014, the court adopted the agency's proposed findings and orders and transferred the cases to Contra Costa County.

## II.

### *The Proceedings in Contra Costa County Superior Court*

### A. The Contra Costa County Juvenile Court Accepts the Case Transfers.

On July 22, 2014, the juvenile court for Contra Costa County held a hearing at which it accepted the transfer of the cases from Alameda County Superior Court and scheduled a hearing for August 2014 for appointment of counsel. At the latter hearing, it set a hearing for September 2014 for consideration of updated information to be provided by CFS.

### B. CFS's September 8, 2014 Update and the Court's Hearing

On September 8, 2014, CFS filed a written update on mother and the five children. It reported that its social worker met with mother for the first time in August 2014, provided her with bus and BART tickets, referrals for individual and family counseling, along with information to begin drug testing. She requested that mother schedule medical appointments for J.H. and M.G. and dental appointments for all of the children. She met with mother again on September 2, 2014. Mother reported having phoned a psychotherapy institute, but said services were delayed because she needed to transfer her MediCal and CalWorks from Alameda County to Contra Costa County. Mother said she received SSI (Supplemental Security Income) "for her learning disability and

10

psychological issues that started when she was two years of age." The social worker asked mother which psychological issues she was diagnosed with, and mother stated she had been diagnosed with Bipolar Disorder at age thirteen but that that during her time in Union City, "her therapist said her psychological issues are more closely related to her trauma history versus Bipolar Disorder."

CFS further reported that mother enrolled for drug testing on August 28, 2014. She was tested on September 2, 2014, and the results were negative for all drugs and alcohol. Mother asked how long she would need to test, and the social worker told her to continue calling each morning and to test when her letter was called.

CFS reported about each of the children living with mother at home. In her first visit with the social worker, M.G. presented as "upbeat and sociable," but on subsequent visits was home from school in pajamas and stated she did not feel well. She had been absent for eight days, which was about 30 percent of the school days in the current school year, and had fallen behind in her assignments, causing her teachers and the school staff to become concerned about her. The principal visited the home and found M.G. with mother, who stated that M.G. had missed the bus. "It was the impression of the Principal and Vice Principal that [M.G.] was responsible for getting herself up and ready for the bus independently although [M.G.] does not have her own alarm clock." M.G. told her teachers she " 'love[d] school,' " and she reportedly did well and had no behavior problems when she attended.

On September 5, 2014, CFS's social worker made an unannounced home visit and found M.G. home from school. Mother said M.G. was still ill. The social worker expressed the importance of M.G. going to the doctor and mother agreed to make an appointment for her immediately. As of September 9, 2014 she had not responded to the social worker's request for an update.

J.H. "presented as reserved and reticent to speak" with the social worker at visits. Mother and J.H. reported he was doing well at his new high school. He had a number of unexcused absences, but no behavioral concerns.

11

Z.D. presented as "shy in that he hid his face in his mother's shirt and did not respond to questions." He began to "share with the Social Worker towards the end of the visits with encouragement from [mother]."

N.D. "presented as vocal and energetic" and displayed a "somewhat aggressive behavior" as demonstrated by "stepping on the dolls and pushing the Social Worker." Mother redirected her on both occasions.

Mother stated she was working with the Contra Costa Children's Council to "find school programming for [Z.D.] and [N.D.]," who were on a waiting list. Both children were seen at a health center in May 2014, during which skin tests for tuberculosis were placed, but mother did not return to the center for the results. Mother provided medical and immunization information to the social worker.

CFS further reported that S.B., who was staying at a group home, had engaged in "a pattern of going AWOL from her group home and running to mother's home." It recommended that "[d]ue to mother's lack of boundary setting with [S.B.] and [S.B.]'s history of going AWOL," she be transported by group home staff rather than being allowed to travel by BART independently. She was otherwise doing well, and being provided mental health services.

CFS concluded that mother had "made progress in some areas since the case was transferred," including enrolling in and completing drug testing, contacting the psychotherapy institute, and scheduling dental appointments for all four children. However, she had "not progressed in other areas creating substantial concerns for [CFS] in regards to the care of the children." She had not informed the social worker "when [S.B.] AWOL'ed to the family home, ha[d] failed to take [J.H.] and [M.G.] for medical appointments even given [M.G.]'s extended time away from school due to illness and ha[d] not consistently demonstrated the ability to ensure [M.G.] attends school." Mother's "motivation to maintain her family and the progressive steps she has taken thus far" were such that she "may likely demonstrate continued progress on her Case Plan with the continuation of services and ongoing supervision by [CFS]." CFS recommended that the children continue as dependents of the court and that the court set a 12-month

12

status review hearing regarding family reunification services for S.B. and family maintenance services for the other children.

At a hearing on September 10, 2014, the juvenile court set a 12-month review hearing for January 8, 2015, and ordered CFS "to closely monitor child's school attendance."

## C. The First Supplemental Petitions Regarding Mother's Drug Use

On October 15, 2014, CFS filed supplemental petitions pursuant to section 387,[9] alleging that the previous disposition was not effective because mother "has a substance abuse problem that impairs her ability to parent the child," having tested positive for methamphetamine on or about October 1, 2014. Further, mother was not in compliance with her case plan in that she did not follow through with the children's dental appointments, secure therapy for them, or secure therapy for herself.

CFS submitted a memo to the court with its supplemental petitions. It stated that its social worker, upon receiving a drug test for mother that was positive for methamphetamine, visited the home on October 7, 2014, and found no one there; mother said in a phone call the next day that she "was not surprised and expected a positive result from that particular test" because she had "had a 'meltdown' and chose to use methamphetamines." She claimed it was her first time using them, that her sister's friend offered them to her, and that the children were with her other sister at the time and not with mother. She stated "she didn't think about the drug testing as she was depressed and thinking about the death of her mother." When told the test result would mean her four younger children could be removed from her care, she "expressed remorse" and expressed willingness to participate in an outpatient program. Five days later, mother phoned the social worker and told her she had enrolled in a recovery program that would begin on October 20, 2014.

---

[9] Section 387 provides for a social worker to file a supplemental petition requesting a change in a previous order to remove a child from a parent's custody because the previous disposition "has not been effective in the rehabilitation or protection of the child."

13

CFS indicated that mother had been drug tested four times since August 2014. Two of those tests produced negative results; in September 2014, she tested positive for morphine and on October 1, 2014, she tested positive for methamphetamine. Mother had provided documentation confirming she was seen at San Francisco General in the Emergency Department on the September test date, and claimed it was for stomach pain that was diagnosed as kidney stones. She said she was released from the hospital with a prescription for Percocet.

CFS described a visit with the four younger children in the home on October 3, 2014, at which J.H. engaged with the social worker, M.G. reported no concerns, and the two youngest children appeared well cared for. However, N.D. sought attention, vacillating between aggressive and endearing behaviors, such as kicking and then hugging both mother and the social worker. Mother reported that she had not taken the four children to their scheduled dental appointments on September 25, 2014, had not scheduled well-child physical examinations for J.H. and M.G., and had not initiated therapeutic services for herself or the children. S.B. had been AWOL from her group home since September 10, 2014.

CFS recommended that the court detain the four children and provide mother family reunification services. It would "recommend substance abuse treatment, attendance at meetings, and continued drug testing for the mother in an updated Case Plan."

On October 15, 2014, the juvenile court ordered J.H., M.G., Z.D. and N.D. detained and placed in the home of a relative or in a licensed foster care home, and set a date for a jurisdiction hearing on the supplemental petition. It ordered alcohol and drug testing, substance abuse treatment and parenting education for mother and Antonio, and supervised visitation for mother, pending further proceedings.

On November 12, 2014, the juvenile court held the jurisdiction hearing on the supplemental petition, at which mother waived her rights and pled no contest and the court sustained the petition. Between the jurisdiction and disposition hearings, the court

14

appointed an attorney and CAPTA (Child Abuse Prevention and Treatment Act) guardian ad litem for the children.

Prior to the February 23, 2015 disposition hearing, CFS submitted two reports to the court, dated December 11, 2014, and January 28, 2015, in which it recommended family reunification for mother and for M.G.'s father, and that the court set a sixth-month review hearing. CFS's significant new information included that J.H., who had been placed in a foster home, had met with another child of similar age who was in a different foster home and the two were seen by her foster brothers "touching each other's private parts under their clothing." J.H. had lied to his foster mother about where he was going. In the meanwhile, the social worker was investigating a referral that alleged J.H. had touched N.D. inappropriately in the past. J.H. had admitted that he did so, claiming he was "high on marijuana at the time of the incident."

Z.D., who with M.G. and N.D. had been placed in a foster home separate from J.H., was enuretic at night, stayed up late, walked around the house at night, and climbed into bed with his foster brother. N.D. had night terrors, climbed into bed with her foster mother, was enuretic several times per week, screamed at night and had trouble going to sleep. A cousin of Antonio's had been approved as a caretaker for N.D. and Z.D., but mother was opposed to that placement. M.G., in the meanwhile, had generally been doing well and had participated in a four-hour visit with her father, who had been located and found by the court to be her presumed father.

CFS reported it had given mother referrals to parenting education, outpatient and inpatient drug treatment programs, drug testing, visitation, placement assistance for her children and case management assistance. It concluded that, because of mother's "failure to address her substance abuse history as of this time, it would not be considered safe to return the children to her care." Mother had not participated in drug and alcohol testing from October 17 through December 11, 2014, and it was "unknown if she continues to use drugs at this time." Also, mother had "a history of failure to maintain consistent compliance with her Case Plan," as a result of which there is no assurance that she could provide a safe and stable home for the children.

15

In its follow up report, CFS stated that mother had been admitted to The Rectory Residential Drug Treatment Program on December 4, 2014, but that she had "self-discharged" on December 22, 2014, stating she feared she would lose her Section 8 housing if she continued to live elsewhere. She said she was attempting to enter an outpatient treatment program while waiting for another opening at The Rectory. She hoped to be able to pay for three months rent in advance in the meanwhile to avoid eviction. Mother's letter had been called for drug testing on 15 occasions between September 2 and December 19, 2014. She had broken 11 appointments, tested negative three times, and tested positive for opiates one time.

CFS's recommended case plan update for mother included several new objectives: that she stay free from illegal drugs and demonstrate her ability to live free from drug dependency, including complying with all required drug tests; that she cooperate with the social worker by permitting access to her home with or without an appointment, notify the social worker immediately of changes of address or telephone number and complete face-to-face meetings with the social worker at least monthly; that she complete regularly scheduled visits with the children as arranged by the social worker and notify the latter 24 hours in advance if she was unable to complete a scheduled visit; and that she show she would not permit others to sexually abuse her children. The plan also identified as mother's responsibilities that she enter and complete individual counseling approved by the social worker and "receive a positive evaluation from the therapist that [she] understands the factors contributing to this dependency, has successfully addressed those issues, and the children are not at risk." Also, mother should participate in the children's mental health treatment as recommended by the therapist, participate in the children's sexual abuse treatment and participate in a program of family sexual abuse counseling to address molestation within the family.

At the disposition hearing on February 23, 2015, the court found that the children continued to be persons described by section 300, subdivision (b) and that, by clear and convincing evidence, there was substantial danger to the children's health if they were

16

not removed from the home. Mother's services were changed from family maintenance to reunification, and visitation was ordered for mother.

Mother's failure to grapple with her substance abuse continued to be a problem in the ensuing months. CFS reported to the court on March 26, 2015, that mother had entered a new residential treatment program on March 25, 2015, with the "full intention to remain in treatment until completed." However, mother's compliance with drug testing in 2015 included eight missed appointments and four tests that were negative for drugs and alcohol. In the meanwhile, N.D. and Z.D. had visits with their father's paternal cousin, Ms. McClure, which had gone well, and CFS was recommending that they be placed with her. The court approved that placement at a contested placement hearing on June 10, 2015.

## D. The Supplemental Petitions Regarding a More Restrictive Placement for Z.D. and N.D.

On August 18, 2015, CFS filed additional supplemental petitions for a more restrictive placement for Z.D. and N.D.. Ms. McClure had informed CFS that N.D.'s and Z.D.'s needs were greater than she felt able to meet. She described them as engaging in "serious sexual acting out behaviors." She reported that they "engage in sexual behavior with each other and that [N.D.] masturbates excessively and encourages other children to do so as well." She also indicated they were a "danger to anyone they came in contact with." "[N.D.] bites, hits, throws things, destroys property, and turns on the stove," while Z.D. "will expose himself and urinate on the bathroom walls and his bed."

At an August 9, 2015 uncontested hearing, the court expressed "concerns about the behaviors that are described for the children and what appears to be potentially rather extensive sexual molestation and sexual abuse issues, perhaps associated with some of the disclosures that [J.H.] had previously made. These children are going to be in need of extensive and intensive therapeutic services."

Mother's counsel informed the court that mother had completed her program, was continuing in outpatient treatment, and was attending 12-step meetings. Further, mother had housing with room enough for "overnight visits." The court commended mother for

17

her "very hard" work but indicated that "[w]e need to focus a little bit also on therapeutic services so you understand the depth of the issues with the children and how to respond appropriately to those issues." The court expressed the hope "that mom is being offered services to address" the children's "sexualized behaviors." It declined to allow mother overnight visits "until we hear from therapeutic treatment providers as to whether or not those are advisable."

Regarding J.H., the court requested an update "as to whether or not [J.H.] has been engaging in sexual offender treatment." The court indicated that J.H. may well have been a victim himself and said it wanted "to make sure that he is receiving appropriate therapeutic services so that he doesn't end up victimizing or posing a risk to other children that he may encounter along the way."

Prior to the next hearing, an uncontested jurisdiction hearing on the additional supplemental petitions, CFS reported that mother had continued to participate in outpatient services at Ujima East since August, and that CFS had recently contacted her "to determine if she is receiving services on how to effectively parent children with sexually acting out behavior at Ujima East." It offered to refer her to a therapist who could help her obtain those services if her current therapist could not address them. Mother informed CFS that she was receiving those services from Ujima East and had attended one session of individual therapy to date.

At the jurisdiction hearing on September 9, 2015, the court noted that "I know that mom was recently hospitalized and is only recently out of the hospital." The judge asked the social worker "to provide mother with referrals for therapeutic services relating to the sexual abuse and acting-out behaviors of the children," stating, "I do not believe Ujima East to be an adequate provider of those services. So it would need to be some other service provider who has expertise in those areas." The court also admonished that "mother should not be having any unsupervised visits with the children if she is not in compliance with her case plan. Apparently, she's been meeting [M.G.] in the community and spending four hours or so with her, which is perhaps appropriate. Maybe she's fully engaged in services, I don't know. But I want to make sure that [the social worker] is

18

aware of that contact and that [she] has authorized that because mom is fully engaged and in compliance, which she might be. I don't know." Mother's counsel stated that mother "had been the last time I talked to her."

The court sustained the allegations in the additional supplemental petition, finding that N.D. and Z.D. posed a risk to themselves and the other children in the home and ordered them detained and "moved to separate Intensive Treatment Foster Care" homes so that they did not undermine each other's success or pose a danger to each other.[10] The parties waived disposition.

### E. The September 30, 2015 Status Review and Hearing

CFS submitted a report for a combined six-month and 12-month status review hearing scheduled for September 30, 2015. CFS reported a series of statements by mother to CFS over the previous two months. On August 17, 2015, mother called and said she was called to test on August 15, 2015, the same day she had surgery at Marin General Hospital, was on medication that could result in a positive test, and was " 'out of commission' during that time." She said she had ended up at Marin General because she was visiting her oldest daughter's paternal grandmother when she began throwing up and was taken to the emergency room. On September 2, 2015, she called and said she had fluid removed from her right ovary, she had a cyst on her left ovary and she was living in Antioch with her pastor. She had been prescribed morphine and Dilaudid while in the hospital, was discharged on August 21, 2015, and given Norco to take at home. She had last tested on August 31, 2015, and may have tested positive due to the medication. On September 4, 2015, mother called and said she had been admitted again at Marin General the previous day with a cyst on her left ovary and internal bleeding, had another surgery to have the cyst removed, and was hospitalized from September 3 to September 9, 2015. On September 23, 2105, mother said she was again living with her pastor in Antioch and had resumed participation in Ujima East Program.

---

[10] M.G. had been placed with her father and was doing well.

CFS also reported that mother had missed six drug tests between July and August 2015. Mother said she was hospitalized on the July dates, but could not explain the missed August dates. In August, she tested positive for THC; she said she had been " 'around a lot of people who were smoking marijuana.' " In September she tested positive for oxycodone; she said it was because she was prescribed Percocet for a recent surgery. CFS asked mother for hospital paperwork and medication bottles or prescriptions related to her surgeries. She had failed to provide anything.

CFS stated that mother had visited once with M.G. She had last visited with Z.D. and N.D. on August 5, 2015, before they were placed with their new caregivers, although she had spoken with them by telephone on several occasions. She said she lacked the funds to travel to the visits because her Social Security EBT card had been stolen; also, her surgeries had made her physically unable to visit with the younger children, who were very active. The social worker provided her additional transportation funds on September 24, 2015, to allow her to visit with the children. CFS recommended continued reunification services to mother.

Mother did not appear at the September 30, 2015 hearing. The court stated that it had "a lot of concerns" based on its reading of the CFS report. It continued, "I do not see a basis to continue services to mother based on what is contained in this report." Later in the hearing, the court elaborated: "Well, apparently, even without [subpoenaed medical records, the social worker] believes there's a substantial probability that these children should be returned at the 18-month mark even though mother has failed to show any proof that her positive tests are the result of prescription medication that she has had to take as a result of hospitalizations. So I'm very concerned about that." The court also said it "would be hard-pressed to find reasonable services based on my reading of this report, and that's all that's offered." It noted that the attorney for Z.D. and N.D. had expressed "concerns about reasonable services to [them] in terms of therapeutic services and . . . about visitation with their father." That attorney expressed concern about the failure to arrange sibling visits with their sister, M.G., and M.G.'s counsel joined in that concern. Antonio's counsel also stated Antonio had not had visitation with N.D. and

20

Z.D. since the spring even though the court had indicated that if the first visit went well more visits would be ordered.  The court expressed frustration about not knowing whether there was "passivity, neglect or there's lots of information and it simply isn't in the report, which is why . . . we need [the social worker] here."  In particular, the court was displeased about the social worker's apparent intention to postpone visits between Z.D. and N.D. and their father, and about the absence of information in the report about the children's attendance at school.  The court again ordered this visitation with father, to commence immediately, with Z.D. and N.D. to visit separately.  The court then set the matter for a contested hearing on October 29, 2015.

## F.  The October 29, 2015 CFS Memo and Contested Status Review Hearing

CFS submitted a court memo for the October 29, 2015 contested status review hearing, in which it recommended termination of reunification services to mother.  It stated that mother's whereabouts were "currently unknown," that she had left a voicemail for the social worker on October 22, 2015, stating that she had been called to drug test but had not because she had been hospitalized, that the social worker had returned the call and had left a message seeking more information and that mother had not called back.  Mother had informed the social worker on October 12, 2015, that she was living with her pastor, but the pastor had denied this and did not know mother's whereabouts.  Mother had missed two drug tests in September 2015 and had a positive test for Oxycodone that month.  The social worker had contacted her to ask about the missed dates, but mother had failed to return the call.  Mother had failed to test on four additional dates in October 2015.

CFS reported that mother also had failed to stay in contact with her children.  She had called Z.D.'s caregiver only twice during September and October 2015.  On one occasion, she called after Z.D.'s bedtime on the day before his birthday and then failed to call the next day as instructed.  When the caregiver called mother, she had little to say except "Happy Birthday."  Mother had weekly phone visits scheduled with N.D., but had called her only three times since N.D. was placed with a new caregiver in August.  The caregiver had begun to initiate calls with mother, but the conversations were focused on

21

mother's placing fast food orders. N.D. had recently told the caregiver she no longer wanted to talk with mother and said the caregiver was her mother. Mother told the social worker she had not been in phone contact with the children because she had " 'lost her phone and did not have anyone's phone number.' "

CFS reported that mother had not visited her children with any regularity. She had not visited N.D. or Z.D. since August 5, 2015. M.G. stated that mother would call during the week and say she would be at their scheduled Saturday visits but " 'never shows up.' " She visited M.G. on October 12, 2015, according to M.G.'s father. She had last visited J.H. on September 26, 2015.

CFS stated that on October 12, 2015, mother informed the social worker she was still in her outpatient program and had been attending except when she was in the hospital. About two weeks later, the social worker called mother's program counselor, who said mother was last seen on October 9, 2015, when she was discharged for excessive absences.

Also, CFS reported, mother had failed to provide documentation of her surgical procedures or her medication. For that reason, and because of her failure to visit her children consistently, her positive drug tests and many missed drug tests, her failure to demonstrate participation in her outpatient program and her failure to inform the social worker of her whereabouts, CFS recommended that the court discontinue her reunification services and set a placement hearing for the children.

At the October 29, 2015 hearing, the attorney for Z.D. and N.D. agreed with CFS's recommendation to terminate mother's services and set a section 366.26 hearing. Mother's counsel objected to termination, complaining she had not had time to review the CFS report with mother because it had arrived only the previous day. The court noted that CFS had not been required to prepare an updated memo and could have presented the information at the hearing orally, and that all of the information in the updated report was new. Therefore, the court denied what it construed as a request for a continuance. It invited counsel to cross-examine the social worker and invited mother to testify if she wished to do so.

Mother's counsel then presented evidence about mother's hospitalization and medications. First, counsel offered in evidence a hospital wrist band dated September 3, 2015, hospital paperwork dated October 3, 2015, and a prescription bottle dated September 9, 2015, each of which bore mother's name and date of birth.[11]

Mother's counsel called the CFS social worker, Ms. Williams, who was the only witness at the hearing. She testified that mother had said she did not have but would obtain from the hospital the documentation of her hospitalization, that mother had explained her failure to visit the children as the result of her being in the hospital on some days and not feeling well, that arrangements were made for telephone visits between mother and the two younger children, that mother had explained her failure to call them by saying she had lost her phone and the contact information for the caregivers, that mother had scheduled a visit with Z.D. and N.D. for that day (October 29), that mother had said the absences she had from the outpatient program were the result of her hospital stays and that she intended to go back into the outpatient program once her health improved, that mother had visited M.G. in October and had seen J.H. "on a regular basis," and that there had been no concerns about her behavior during visits with the children. Mother had last visited Z.D. and N.D. on August 5, 2015. Williams did not have a current address for mother.

In her closing, mother's counsel asked the court to extend mother's reunification services. She acknowledged that mother "has unfortunately taken a step back," but attributed mother's positive drug test results and her missing "many days of programs and some of the visits with the children" to mother's health problems. She emphasized

---

[11] The court described these items as "a two-page document that appears to be from San Francisco General Hospital and Trauma Center" "entitled "Terms and Conditions of Admission for Acute Inpatient, . . . Outpatient and Emergency Services,"" bearing mother's name and date of birth and "a date of October 3, 2015"; a "Xerox copy of what appears to be a torn off wristband for [mother], same birth date from Marin General Hospital, with a date noted on here of September 3, 2015"; and "a Xerox copy of a Walmart pharmacy prescription label in the name of [mother] for oxycodone dated September 9, 2015."

that mother had had good visits with the children and that mother intended to "get back in program once her health is improved."

CFS's counsel argued that it was "questionable if [mother] ever really was engaged in pursuing drug treatment testing." Counsel noted that mother "began in July with missing drug tests, and she had positive drug tests. And then she was also positive for marijuana." Mother "never really applied herself to the drug treatment program that she's entered and quickly discharged from." As to mother's statements about hospitalizations and surgeries, "[w]e don't have any credible evidence to say exactly what day she was in the hospital or if it was actually outpatient. It's not clear from any of the evidence that's presented by [m]other." Further, mother had continued to miss drug tests in October and had not "fully exercised all of her visits." She had not been forthcoming, and had been "somewhat deceptive in what she's told the agency." CFS had "learned at the last hour that the address she told us she was staying is not—[m]other doesn't live there." The children could not be returned to her "based upon failure to test, failure to engage in individual counseling, failure to stay in drug treatment, failure to exercise her visits to even understand the needs of her children." Mother's behavior showed "a lack of capacity to understand or demonstrate that she's able to overcome the obstacles that brought this case to us in the first place."

The court decided to terminate services to mother. It stated that the evidence indicated "[m]other has not only not made substantial progress, she's demonstrated that she's made no progress whatsoever in addressing the issues that originally brought these children before the court back in Alameda County." After noting that the children had been before a dependency court since January 2014, the court observed a "consistent message and theme" in the record was that mother was, as "reported by the social worker in Alameda County . . .[,] absent, evasive and not forthcoming. And that it was a challenge to engage her in services." Although mother had been offered reasonable services and a great deal of time to address the issues that brought her and her children before the court, she had "made absolutely no progress whatsoever."

24

Furthermore, the court continued, there was no evidence that mother had been hospitalized for an extended period of time; to the contrary, the evidence "could as easily and reasonably be interpreted that she went in and was seen and released." Mother had "ample opportunity" to bring evidence before the court "that she has been fighting a significant health issue that took her from her treatment, that forced her not to see her children, the two youngest, for over two-and-a-half months, to stay in regular contact with them, to participate in individual therapy and counseling, and to fail to drug test on the numerous dates when she was scheduled to test. There's simply no evidence to support that claim whatsoever. [¶] So I do not believe that that was a barrier to her participation in services in this case. [¶] These children have significant issues that I believe are directly related to the gross neglect through [m]other's longstanding chronic substance abuse issues that were noted in the Alameda County reports and [m]other's use of prescription medication and other substances. And she continues with prescription medication and testing positive for substances when she does test and failing. And I consider each one of her failures to test a positive test. [¶] These children deserve stability, and they have lacked it for years now. And it is time for them to move on and be in a safe, nurturing, stable environment that [m]other is incapable of providing them here today." The court found reasonable services had been offered to aid in returning the subject children home, and that return to mother's custody would create a substantial risk to the children. It terminated reunification services to mother and scheduled a section 366.26 hearing.

## DISCUSSION

Status review hearings in dependency cases are governed by section 366.21. In a six-month or twelve-month review hearing, "after considering the admissible and relevant evidence, the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (e)(1).) "If the child is not returned to his or her parent or

25

legal guardian, the court shall determine whether reasonable services that were designed to aid the parent or legal guardian in overcoming the problems that led to the initial removal and the continued custody of the child have been provided or offered to the parent or legal guardian. The court shall order that those services be initiated, continued, or terminated." (*Id.*, subd. (e)(8).)

"The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental. In making its determination, the court shall review and consider the social worker's report and recommendations and the report and recommendations of any child advocate appointed pursuant to Section 356.5; and shall consider the efforts or progress, or both, demonstrated by the parent or legal guardian and the extent to which he or she availed himself or herself of services provided, taking into account the particular barriers to a minor parent or a nonminor parent, or an incarcerated, institutionalized, detained, or deported parent's or legal guardian's access to those court-mandated services and ability to maintain contact with his or her child." (§ 366.21, subd. (e)(1).)

# I.

### *Substantial Evidence Supports the Trial Court's Finding That CFS Offered Reasonable Services to Mother.*

Mother argues that the agency and the juvenile court knew she had a history of mental health issues and that "despite the abundance of uncontradicted evidence of the mother's mental illness, and the fact that she was not receiving prescription medication for her bipolar disorder, the agency failed to provide for any mental health component in the mother's case plan, which the court adopted as its court-ordered reunification case plan at the disposition hearing of February 23, 2015." Mother cites *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1792 and *In re Victoria M.* (1989) 207 Cal.App.3d 1317, 1320 for the proposition that family reunification plans must be designed to meet the needs of a mentally ill or disabled parent.

There are two major problems with this argument. The first, which alone would be reason enough to reject it, is that mother, who was represented by counsel throughout the proceedings, did not at any point during the reunification period, including at the combined six- and 12-month review hearing, object to the case plan offered by CFS and approved by the juvenile court regarding mother as inadequate. CFS's argument is well taken that having never complained about the claimed lack of reasonable services in the juvenile court, at a time when that court could have rectified any deficiency, mother should be precluded from raising it here. (See *In re Christina L.* (1992) 3 Cal.App.4th 404, 416 (*Christina L.*) [if the mother "felt during the reunification period that the services offered her were inadequate, she had the assistance of counsel to seek guidance from the juvenile court in formulating a better plan"].)

Second, even if we were to address the merits, the record amply supports the juvenile court's findings. Here, at the outset of the dependency case initiated in Alameda County Superior Court, the court, when it approved the agency's recommendation to leave the children with mother and ordered the agency to provide family maintenance services, ordered mother to "cooperate with the Child Welfare Worker and to participate in all aspects of the case plan." The agency's initial case plan required mother to obtain general counseling, *a psychiatric/psychological evaluation*, and psychotropic medical evaluation and monitoring. It also required counseling for J.H., M.G. and Z.D. In the six months following the January 22, 2014 rulings by the juvenile court, mother moved with the children to Antioch to live with her pastor, was "not there for long periods of time" and was evasive about her and the children's whereabouts. The information she provided to the social worker about her illnesses and willingness to participate in the case plan "did not add up." Significantly, she "*did not participate in a medication evaluation, a psychological evaluation, individual counseling family counseling as well as therapy for the minors*. She stated that her pastor is providing counseling for her family and that *she does not want anyone [else] counseling or medicating her or her children*." (Italics added.) In June 2014, weeks before the scheduled review hearing on July 9, mother

27

"stated that she scheduled the medication evaluation and psychological services for herself and for the minors in Antioch."

This was the state of affairs relating to mother's mental health issues when the cases were transferred to Contra Costa County, with her case plan remaining in place. Upon the transfer in August 2014, mother informed the new social worker of her learning disability and mental health issues, including that she had been told that her psychological issues were more closely related to her "trauma history" than her bipolar disorder. She also reported having phoned a psychotherapy institute. However, mother stated that services were delayed because she needed to transfer her MediCal and CalWorks from Alameda County to Contra Costa County. There is no evidence indicating mother followed up in the ensuing two months with the psychotherapy institute or obtained any of the psychiatric and related medical and counseling services she had been offered, although there is evidence that she *failed* to comply with other aspects of her case plan such as ensuring the children were receiving medical and dental care and that her school-aged children were attending school.

Thus, the record makes clear that in connection with the disposition of the initial petition, mother was offered appropriate services for her reported psychological issues, including a psychological evaluation and psychological counseling, repeatedly did not pursue these services, and then when she first met with the CFS social worker downplayed the role her bipolar disorder might have played in her conduct. It is well-established that " 'services are voluntary, and cannot be forced on an unwilling or indifferent parent.' [Citation.] . . . 'The requirement that reunification services be made available to help a parent overcome those problems which led to the dependency of his or her minor children is not a requirement that a social worker take the parent by the hand and escort him or her to and through classes or counseling sessions. A parent whose children have been adjudged dependents of the juvenile court is on notice of the conduct requiring such state intervention. If such a parent in no way seeks to correct his or her own behavior or waits until the impetus of an impending court hearing to attempt to do so, the legislative purpose of providing safe and stable environments for children is not

28

served by forcing the juvenile court to go "on hold" while the parent makes another stab at compliance.' " (*Christina L.*, *supra*, 3 Cal.App.4th at pp. 414–415.)

In any event, another serious problem—namely mother's substance abuse—reared its head in October 2014, at which point the social worker's focus shifted to addressing that problem. In early October 2014, mother tested positive for methamphetamine, necessitating that CFS file a supplemental petition seeking to remove the children from mother's home. The petition asserted three grounds: mother's substance abuse problem (methamphetamine use), failure to follow through with the children's scheduled dental appointments and failure to obtain therapy for the children, the latter two failures in violation of her case plan. And during the remainder of the proceedings, CFS focused significantly, though by no means exclusively, on efforts to get mother into treatment for her substance abuse.

Simply stated, mother was not only offered but ordered to engage in services that were specifically designed to address mental health issues, not only counseling but a psychiatric/psychological evaluation and psychotropic medication evaluation and monitoring. Mother failed, and at one point expressly refused, to participate in these mental health services, claiming she did not want anyone counseling her or her children other than her pastor, or medicating them. CFS pursued this issue but ultimately spent much of the remainder of the next year addressing mother's increasingly evident substance abuse problem. It was reasonable for CFS and the court to place their primary focus on the substance abuse problem once mother tested positive for methamphetamine, since they could reasonably believe it would be difficult or impossible to evaluate or treat underlying mental health issues effectively as long as mother was using drugs. The record as a whole shows that CFS "faced with these problems, made a 'good faith effort to develop and implement a family reunification plan.' " (*Christina L.*, *supra*, 3 Cal.App.4th at p. 417, quoting *In re John B.* (1984) 159 Cal.App.3d 268, 275.) Unfortunately, mother was either unwilling or unable to avail herself of the services

29

offered, either those related to her substance abuse or to the underlying mental health issues that may have contributed to it.[12]

"In reviewing the reasonableness of the services provided, this court must view the evidence in a light most favorable to the respondent. We must indulge in all legitimate and reasonable inferences to uphold the verdict. If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.) In this case, there is substantial evidence of reasonable services, and having so found, our inquiry ends.[13]

## II.

### *Substantial Evidence Supports the Trial Court's Finding That the Children Could Not Safely Be Returned to Mother Within Eighteen Months.*

Mother contends there was not substantial evidence that the children could not be returned to her care within 18 months after their removal. She cites section 366.21, subdivision (g)(1), which provides in relevant part that if court-ordered services have been provided for more than six months for a child under three or more than twelve months for a child three or older, and the child has not been returned to the custody of a parent at the permanency hearing, the court "shall continue the case only if it finds that there is a substantial probability that the child will be returned to the physical custody of his or her parent . . . and safely maintained in the home within the extended period of time or that reasonable services have not been provided to the parent . . . ." The subdivision goes on to state that in order to make that "substantial probability" finding, the court must find that the parent: "has consistently and regularly contacted and visited with the child"; "has made significant progress in resolving problems that led to the child's removal from the home"; and "has demonstrated the capacity and ability both to

---

[12] We do not express an opinion as to whether mother was, as she now argues, "self-medicating," because it has no bearing on whether reasonable services were offered in this case.

[13] Mother points out that the standard of proof of reasonable services is "clear and convincing evidence" at the stage where the court orders a section 366.26 hearing. That does not change our conclusion.

complete the objectives of his or her treatment plan and provide for the child's safety, protection, physical and emotional well-being, and special needs."

The trial court in this case found that mother had not consistently stayed in contact with or visited the children. It also found she had made "no progress" in resolving the problems that led to the children's removal, even though she had a great deal of time to do so. It rejected mother's arguments that her medical condition and treatment had been barriers to her ability to visit the children or participate in services, finding the evidence mother offered failed to support her arguments. Finally, it found that mother continued to use drugs and could not provide a stable home for the children.

Mother's substantial evidence argument focuses on a cherry-picked description of the record, pointing out those aspects of mother's conduct that were positive, and on a recitation of the principle that preservation of the family is an important objective of the dependency statutes. The problem with this argument is that mother neglects to mention the extensive history of her failures to do any of the things section 366.21 requires before the juvenile court can extend reunification services beyond the statutory six- and 12-month periods.

The sad reality is that, as the juvenile court found, mother proved time and again that she was unable, if not unwilling, to address the substance abuse problem that was a significant part of what prevented her from providing a safe home for her children. She started out in the proceedings being evasive and uncooperative with the social workers and complying minimally, at best, with her case plan. While in fits and starts she made some efforts to address her substance abuse issue, she was unable to persevere. When her children were in her care at the outset of the case, she failed to get them medical and dental treatment and to ensure they attended school, even though she was ordered to do them. After the very first drug test, she began asking how long she would have to test. Over the course of the case, she missed many more drug tests than she actually took and tested positive repeatedly when she did test. She checked herself into and then out of treatment programs without completing them. She failed to keep the social worker aware of her whereabouts. And worst of all, she failed to visit or even consistently telephone

31

her children, causing them great disappointment. Not only was there substantial evidence supporting the juvenile court's findings; the evidence that the children could not safely be returned to mother was in the end overwhelming.

We note that Judge Hardie's oversight of these cases was exceptional. This was no easy set of cases. It involved five children, with four fathers (two present and two not), and a custodial mother with an extensive social welfare history. Part way into the case, after its transfer to Contra Costa County from Alameda County, mother's substance abuse problem came to light, requiring a change of direction. Also emergent after the case landed with Judge Hardie was a serious sexual molestation problem among the children that required additional changes in placements and visitation. The judge dealt with these issues as they arose in a thoughtful and effective way. At the many hearings she held in these cases, she closely oversaw the social workers' efforts, monitored the children's well being and insisted that their needs be met, and addressed mother's progress and (mostly) lack of progress in tackling the issues that led to the children's removal. She praised mother for her successes, modest as they were, while encouraging her to engage in therapies to address the sexual abuse issues the children had manifested. And she did all of this while keeping the cases on track. In the end, she did exactly what was required of her: she did what was best for the children, concluding that the time had come to seek as stable a situation as could be found for them going forward. We commend her.

## DISPOSITION

Mother's petition for extraordinary writ is denied, the stay issued by this court on December 2015 is lifted and the case is remanded to the juvenile court for further proceedings. Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

32

_____
STEWART, J.

We concur.

_____
KLINE, P.J.

_____
MILLER, J.